# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

## MOTION INFORMATION STATEMENT

**Docket Number(s):** 23-1281 _____     _____ Caption [use short title] _____

**Motion for:** Leave to File Late Brief

_____

_____

Set forth below precise, complete statement of relief sought:

Appellants seek permission to file its reply brief after

the due date for the brief. The brief is attached to the

motion.

_____

_____

_____

Kafka v. Wells Fargo Securities LLC

**MOVING PARTY:** Joseph A. Kafka, Todd Kafka     **OPPOSING PARTY:** Wells Fargo Securities, LLC

☐ Plaintiff        ☐ Defendant

☑ Appellant/Petitioner     ☐ Appellee/Respondent

**MOVING ATTORNEY:** Mark C. Rifkin     **OPPOSING ATTORNEY:** Christopher J. Houpt

[name of attorney, with firm, address, phone number and e-mail]

Wolf Haldenstein Adler Freeman & Herz LLP        Mayer Brown LLP

270 Madison Avenue, 10th Fl., New York, NY 10016      1221 Avenue of the Americas, New York, NY 10020

212-545-4762  rifkin@whafh.com          212-506-2380  choupt@mayerbrown.com

Court- Judge/ Agency appealed from: S.D.N.Y., Swain, J.

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes    ☐ No (explain): _____
_____

Opposing counsel's position on motion:
☐ Unopposed  ☐ Opposed  ☑ Don't Know
Does opposing counsel intend to file a response:
☐ Yes   ☐ No   ☑ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below?    ☐ Yes ☐ No
Has this relief been previously sought in this court?  ☐ Yes ☐ No
Requested return date and explanation of emergency: _____
_____
_____
_____
_____

Is oral argument on motion requested?  ☐ Yes  ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  ☐ Yes ☑ No  If yes, enter date: _____

**Signature of Moving Attorney:**

/s/ Mark C. Rifkin _____  **Date:** May 2, 2024   Service by: ☑ CM/ECF   ☐ Other [Attach proof of service]

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

| | |
|---|---|
| JOSEPH KAFKA and TODD KAFKA, | |
| Plaintiffs-Appellants | No. 23-1281 |
| v. | |
| WELLS FARGO SECURITIES, LLC, | |
| Defendant-Appellee | |

## APPELLANTS' MOTION FOR
## <u>LEAVE TO FILE LATE REPLY BRIEF</u>

Plaintiffs-Appellants, Joseph Kafka and Todd Kafka (the "Kafkas"), by and through their undersigned counsel, hereby move the Court for permission to file a late reply brief and state as follows in support thereof:

1.	This is an appeal from a decision of the United States District Court for the Southern District of New York, entered on September 15, 2023, dismissing Plaintiffs-Appellants' complaint with prejudice.

2.	The Kafkas timely appealed the District Court's decision on September 18, 2023. Doc. No. 1.

3.	On October 16, 2023, the Court placed this appeal on the expedited calendar. Doc. No. 20.

4.	On November 8, 2023, Defendant-Appellee, Wells Fargo Securities, LLC ("Wells Fargo"), moved to remove the case from the expedited calendar. Doc. No. 26.

5.	On November 13, 2023, the Court granted Wells Fargo's motion and removed the case from the expedited calendar. Doc. No, 30.

6.      The Kafkas timely filed their opening brief and joint appendix on January 2, 2024. Doc. Nos. 40 and 41.

7.      On January 10, 2024, Wells Fargo filed a scheduling notification, requesting 94 days, until April 4, 2024, to file its response brief. Doc. No. 43. The scheduling notification was granted on February 15, 2024. Doc. No. 46.

8.      Wells Fargo timely submitted its response brief on April 2, 2024. Doc. No. 47. However, its response brief was rejected as defective. Doc. Nos. 48 & 49.

9.      Wells Fargo timely filed its response brief on April 10, 2024. Doc. No. 50.

10.     The Kafkas' reply brief was due on April 23, 2024.  However, through clerical mistake, the due date for their reply brief was mis-calendared. The Kafkas' counsel sincerely regret the mistake. On April 25, 2024, the Kafkas submitted a scheduling notification, requesting 40 days, until May 14, 2024, to file its reply brief. Doc. No. 54.

11.     The Kafkas scheduling notification was denied on April 30, 2024, and they were directed to file a motion for leave to file a late brief, with the proposed reply brief attached, by May 2, 2024. Doc. No. 55.

12.     Due cause exists for the Court to permit the Kafkas to file the late reply brief. In its response brief, Wells Fargo raises several arguments not addressed by the District Court in its decision dismissing the complaint and not addressed by the Kafkas in their opening brief.  The Kafkas' reply brief addresses those additional arguments and will aid the Court's consideration of the important and complex issues raised by the appeal.

13.     Granting the Kafkas' request for leave to file the late reply brief will not prejudice Wells Fargo in any way.  Wells Fargo successfully moved to have this appeal removed from the expedited calendar. In addition, Wells Fargo sought and received 94 days to file its response

brief, and did not file a non-defective response brief until 100 days after the Kafkas filed their opening brief. Accordingly, the short delay in the filing of the reply brief will cause no prejudice to Wells Fargo.

WHEREFORE, the Kafkas respectfully request that they be permitted to file the reply brief, attached hereto, out of time.

Dated: May 2, 2024

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By:    *s/ Mark C. Rifkin*
Mark C. Rifkin
270 Madison Ave.
9th Floor
New York, NY 10016
(212) 545-4600
rifkin@whafh.com

*Attorneys for Plaintiffs-Appellants*

# ADDENDUM:

# APPELLANTS' BRIEF

# 23-1281

𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
for the Second Circuit

JOSEPH KAFKA AND TODD KAFKA,

*Plaintiffs-Appellants*,

v.

WELLS FARGO SECURITIES, LLC,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Southern District of New York

## REPLY BRIEF FOR APPELLANTS

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Mark C. Rifkin
270 Madison Ave.
9th Floor
New York, NY 10016
(212) 545-4600
rifkin@whafh.com

GILMAN LAW LLP
Kenneth Gilman
Beachway Professional Center Tower
8951 Bonita Beach Road, S.E.
Suite 525
Bonita Springs, FL 34135
(239) 571-3518
kgilman@gilmanlawllp.com
(239) 571-3518

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CITATIONS ........................................................................ ii

PRELIMINARY STATEMENT ............................................................1

ARGUMENT .......................................................................................4

    A.    Investors in the Funds Were Foreseeably Injured by
           Wells Fargo's Unprecedented and Precipitous Misconduct........................4

    B.    Wells Fargo is Not Entitled to Invoke the Limited
           Protections Generally Given to FCMs........................................................6

    C.    The Economic Loss Rule Does Not Preclude
           the Kafkas' Negligence Claim....................................................................9

           1.    The Kafkas' Tort Claim Does Not Fall Within
                  the Narrow Economic Loss Rule .................................................... 10

           2.    The Tort Duty Here is Extracontractual........................................... 10

           3.    The Kafkas' Loss Resulted from a Sudden or Dangerous Occurrence ............. 14

    D.    The Kafkas Plausibly Allege Tortious
           Interference Claims Against Wells Fargo .................................................16

    E.    Wells Fargo Cannot Invoke the Business Judgment Rule Here.................19

CONCLUSION....................................................................................22

CERTIFICATE OF COMPLIANCE....................................................23

# TABLE OF CITATIONS

**CASES**                                                                    **Page(s)**

*Bogenberger v. Pi Kappa Alpha Corp.*,
   104 N.E.3d 1110 (Ill. 2018) ...................................................................5

*In re Chicago Flood Litig.*,
   176 Ill. 2d 179, 200-01, 680 N.E.2d 265, 275-76 (Ill. 1997),
   *modified by Andrews v. Metro. Water Reclamation Dist. of Greater Chicago*,
   2019 IL 124283, 160 N.E.3d 895 (Ill. 2019) ...........................................14, 15, 16

*Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*,
   159 Ill. 2d 137, 636 N.E.2d 503 (Ill. 1994) .......................................11, 12, 13, 14

*Daugherty v. Blaase*,
   548 N.E.2d 130 (Ill. App. 1989) .........................................................11

*Detterbeck v. Detterbeck*,
   2019 Ill. App. Unpub. LEXIS 2251 (Ill. App. Dec. 11, 2019) ............................11

*Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*,
   281 Ill. App. 3d 789, 666 N.E.2d 881 (1996),
   *aff'd as modified*, 176 Ill. 2d 160, 679 N.E.2d 1197 (1997).........................13, 14

*First Am. Discount Corp. v. Jacobs*,
   756 N.E.2d 273 (Ill. App. 2001) ......................................................1, 7

*Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*,
   973 N.E.2d 880 (Ill. 2012) ..............................................................5, 6

*Kanter v. Deitelbaum*,
   648 N.E.2d 1137 (Ill. App. 1995) ..................................................3, 11, 12

*MacNaughton v. Young Living Essential Oils, LC*,
   67 F.4th 89 (2d Cir. 2023) ...............................................................7

*Moorman Mfg. Co. v. Nat'l Tank Co.*,
   435 N.E.2d 443 (Ill. 1982) ...........................................................*passim*

*Sherman v. Ryan*,
   392 Ill. App. 3d 712, 722,
   911 N.E.2d 378, 389 (2009)..................................................................20

*Simpkins v. CSX Transp., Inc.*,
   965 N.E.2d 1092 (Ill. 2012) ..........................................................2, 5, 6

*Voutiritsas v. McCuaig, Haeger, Bolz & McCarty, LLC*,
   2011 Ill. App. Unpub. LEXIS 3205 (Ill. App. Dec. 21, 2011) ...........11

## STATUTES & RULES

Federal Rules of Civil Procedure
   9(b) .....................................................................................................19

## PRELIMINARY STATEMENT

Defendant-Appellee Wells Fargo Securities, LLC ("Wells Fargo") was not exempt from liability to Plaintiffs-Appellants Joseph Kafka and Todd Kafka (the "Kafkas") as a futures commission merchant when it ordered the complete and immediate liquidation of all the Portfolio investments during the temporary market disruption in February 2018. The narrow decision in *First Am. Discount Corp. v. Jacobs*, 756 N.E.2d 273, 284-85 (Ill. App. 2001), on which Wells Fargo primarily relies in its response brief, does not protect Wells Fargo for its wrongful acts that *grossly exceeded its limited ministerial authority as an FCM*.

Wells Fargo's precipitous course of action had two dramatic and entirely foreseeable consequences. *First*, it deprived LJM of any opportunity to successfully manage the temporary market disruption as it had many times before. A-15 Am. Comp. ¶ 38.[1] *Second*, it caused the Preservation Fund and Partnership Funds to realize what were only, to that point, notional or "paper" losses. A-17 Am. Comp. ¶¶ 46-48. This, and not the liquidity event itself, caused the Kafkas and hundreds of other investors to suffer hundreds of millions of dollars of avoidable losses.

Contrary to Wells Fargo's argument, a duty of care arises whenever a person's

---

[1] Wells Fargo calls the market volatility event "unprecedented." Doc. No. 50. That is not based on any allegation in the Complaint, and it ignores contrary, well-pled allegations that LJM successfully managed other similar market disruptions before 2018. Am. Comp. ¶ 38 at 8.

course of conduct creates a foreseeable risk of injury to another. When "a course of action *creates* a foreseeable risk of injury, the individual engaged in that course of action has a duty to protect others from such injury." *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1097 (Ill. 2012) (emphasis added). When Wells Fargo forced the complete and immediate liquidation of all the Portfolio investments during the temporary market disruption in 2018, it *created* an all-but-certain risk of injury to the investors whose investments were forced to be sold at exactly the wrong time, despite LJM's demonstrated ability to manage market risk. Thus, the Kafkas plausibly assert a viable negligence claim against Wells Fargo.

Wells Fargo may not invoke the narrow protections generally given to FCMs under the federal regulatory scheme because it was *not* acting within its role as an FCM when it took control of the Preservation Fund and the Partnership Funds and ordered the complete and immediate liquidation of the Portfolio. FCMs perform only limited non-discretionary and ministerial clearing and execution services. Rather, Wells Fargo acted as a *principal* – far more than mere ministerial, non-discretionary clearing and execution services – when it forced LJM to liquidate the Portfolio in a matter of hours in the midst of the temporary market disruption.

Nor is Wells Fargo entitled to invoke Illinois's narrow economic loss rule – an issue neither considered nor decided by the District Court. The wrongdoing complained of here does not fall within the economic loss rule. Wells Fargo

concedes that the rule does not apply when the duty of care is extracontractual or when the injury results from a sudden or dangerous occurrence. Both exclusions apply here. Indeed, it is Wells Fargo's primary argument that it owes no contractual duty to the Kafkas. In the service industry, the economic loss rule applies "only where the duty of the party performing the service is defined by the contract between him and his client." *Kanter v. Deitelbaum*, 648 N.E.2d 1137, 1139 (Ill. App. 1995). That is not the case here. Nor can there be any genuine dispute that the Kafkas' injury resulted from a sudden or dangerous condition in the midst of the market disruption on February 5 and 6, 2018.

The Kafkas also assert viable tortious interference claims because their well-pled allegations permit a reasonable inference that Wells Fargo knew its forced liquidation of the Portfolio created a substantial risk of devastating financial injury to the Portfolio investors. Contrary to Wells Fargo's arguments, the Kafkas allege in detail exactly *how* LJM breached its investment agreements with them: it capitulated to Wells Fargo's demand to liquidate the entire Portfolio when it genuinely believed such a course of action was contrary to the Funds' best interests. Acting contrary to a principal's best interest is a clear breach of LJM's contractual duties to the Kafkas and its investors. The Kafkas also allege in minute-by-minute detail how Wells Fargo aided and abetted – indeed, coerced – LJM's breach of contract when it assumed control over the Portfolio and over LJM's operations. Those efforts began

with a phone call from Wells Fargo to LJM on the evening of February 5, 2018, and culminated on February 6, 2018, when it sent two of its own employees to LJM's headquarters to ensure that LJM complied with Wells Fargo's liquidation directive. A-24 Am. Comp. ¶ 85.

Finally, Wells Fargo argues that the Kafkas' aiding and abetting breach of fiduciary duty claim should be dismissed because LJM's decision to liquidate the Portfolio was protected by the business judgment rule. Doc. No. 50 at 46-48. The business judgment rule cannot protect an action taken that is directly contrary to what the actor believes to be the best and most prudent course of action. Here, LJM vigorously opposed liquidating the Portfolio, and it exercised no business judgment when it did so.

Wells Fargo's response brief raises no new issues addressing the Kafkas' breach of contract claims. The Kafkas rest upon the arguments they made on this claim in their opening brief.

## ARGUMENT

### A.    Investors in the Funds Were Foreseeably Injured by Wells Fargo's Unprecedented and Precipitous Misconduct

As the ultimate owners of the funds held by Wells Fargo, investors in the Preservation Fund and the Partnership Funds were knowingly and undeniably the likely and foreseeable victims of Wells Fargo's unprecedented and precipitous misconduct in the midst of the temporary market liquidity event.

Wells Fargo does not dispute that a duty of care arises whenever one person's course of conduct creates a foreseeable risk of injury to another. *Bogenberger v. Pi Kappa Alpha Corp.*, 104 N.E.3d 1110, 1118 (Ill. 2018) (quoting *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092 (Ill. 2012)). Wells Fargo does not even discuss, much less address, those informative decisions, which the Kafkas cited and discussed in their opening brief. Doc. No. 40 at 12-13.

When "a course of action *creates* a foreseeable risk of injury, the individual engaged in that course of action has a duty to protect others from such injury." *Simpkins,* 965 N.E.2d at 1097 (emphasis added). Wells Fargo's precipitous conduct forcing the complete and immediate liquidation of all the Portfolio investments during the market disruption in 2018 *created* a virtually certain risk of injury to all the investors whose investments were forced to be sold at exactly the wrong time, despite LJM's demonstrated ability to manage market risk.

Wells Fargo's primary argument is that it owed no duty to the Kafkas as investors in the Preservation Fund and the Partnership Funds because they had no customer, contractual, or any other relationship, nor any communications or other interactions, with Wells Fargo. Doc. No. 50 at 2-3 and 21-30. However, the common law of negligence imposes no such requirement. As the Illinois Supreme Court held in *Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 973 N.E.2d 880 (Ill. 2012):

The "'relationship' between the plaintiff and defendant" giving rise to a negligence claim "need not be a direct relationship between the parties. Rather, 'relationship' is a shorthand description for the analysis of four factors: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing the burden on the defendant.

973 N.E.2d at 888 (citing *Simpkins,* 965 N.E.2d 1092).

It is axiomatic that one party may be liable to another in negligence even if it has no prior relationship with the other party. Wells Fargo cites no contrary authority in its response brief, and the Kafkas are unaware of any. A pre-existing customer, contractual, or other relationship with the foreseeable victim of one's negligence is *not* a *sine qua non* for a duty of care to arise, or for liability when, as here, that duty is breached.

Under settled tort law, which Wells Fargo has not disputed, a duty of care arose when Wells Fargo directed LJM to immediately liquidate the Portfolio solely for Wells Fargo's own financial interests, not for the investors' interests. *See* A-20 Am. Comp. ¶ 62. Those acts created a foreseeable risk of injury to the Kafkas and all other investors in the Funds. Because it created the foreseeable risk, Wells Fargo incurred a common law tort duty to act reasonably and prudently. It did not do so.

### B. Wells Fargo is Not Entitled to Invoke the Limited Protections Generally Given to FCMs

The essence of an FCM's narrow role is as a *non-discretionary* custodian.

Here, however, Wells Fargo grossly exceeded its limited, *non-discretionary* duty as a FCM when it directed LJM to liquidate the Portfolio.

As it did in the District Court, Wells Fargo nonetheless attempts to invoke the protection given to it as an FCM under the federal regulatory scheme. It does not dispute the limited role of FCMs under that federal regulatory scheme.[2] Instead, Wells Fargo argues that the Illinois Appellate Court's decision *First Am. Discount Corp.*, 324 Ill. App. 3d at 1006-07, permitted Wells Fargo to liquidate a customer's allegedly under-margined account without prior demand or notice and in the absence of any default by LJM. Doc. No. 50 at 23.

Leaving apart that *First Am. Discount Corp.* was an appeal following a bench trial rather than a motion to dismiss, and it involved the regulatory scheme for brokerages rather than FCMs, Wells Fargo's legal argument flatly contradicts the Kafkas' well-pled factual allegations. The Complaint alleges:

> Under the terms of the FCM Agreements, margin deposits were not due until the end of the next trading day (*i.e.*, on February 6, 2018). Thus, on the morning of February 6, 2018, LJM was still in full compliance with its obligations under the Agreement, regardless of how the margin

---

[2] FCMs perform only limited non-discretionary and ministerial clearing and execution services. As the Illinois Appellate Court noted in *First Am. Discount Corp.*, "the duty of care owed by a broker carrying a nondiscretionary account is an exceedingly narrow one, consisting at most of a duty to *properly carry out transactions ordered by the customer*." 756 N.E.2d at 284-85 (emphasis added).

In its decision, the District Court acknowledged that Wells Fargo performed "only certain *limited non-discretionary and ministerial clearing and execution services* as a futures commission merchant." A-117 at 2 & n.3 (emphasis added).

requirements were calculated.

A-19 Am. Comp. ¶ 55. The District Court should not have dismissed the Complaint on the basis of an argument that contradicts or disregards such well-pled factual allegations. *See MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 95 (2d Cir. 2023) (citing *Mayor & City Council of Balt. V. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013)) (court "accept[s] all factual allegations as true and draw[s] every reasonable inference from those facts in the plaintiff's favor").

Despite the circumscribed role of Wells Fargo as an FCM – both as a matter of industry custom and practice and pursuant to the terms of its FCM Agreements with LJM – Wells Fargo did *not* perform merely non-discretionary and ministerial clearing and execution services. To the contrary, as the Kafkas allege in exacting minute-by-minute detail, from late in the evening on February 5 into the early morning hours of February 6, 2018, Wells Fargo asserted complete dominion and control over the entire Portfolio, acted as a principal rather than an agent with limited authority, and forced its complete liquidation.

Nothing about Wells Fargo's conduct on the morning of February 6, 2018, fell within its limited role as an FCM. When it ordered LJM to liquidate the Portfolio – at precisely the wrong time and over LJM's strenuous objection – Wells Fargo was *not* performing non-discretionary and ministerial clearing or execution services. To

the contrary, it was acting as principal, not as agent, as though it (and not LJM) had trading discretion.

FCMs do not *initiate* trades for their customers. They execute trades initiated by their customers. When it acted outside the limited scope of its authority under the FCM Agreements and demanded that its customer, LJM, execute trades that LJM opposed, Wells Fargo turned the FCM relationship upside down. It lost the protections otherwise granted to it under the federal regulatory scheme and by its own FCM Agreements. Wells Fargo has not cited any authority to the contrary.

### C. The Economic Loss Rule Does Not Preclude the Kafkas' Negligence Claim

Next, Wells Fargo argues that the Kafkas' negligence claim is barred by the Illinois economic loss rule. Doc. No. 50 at 30-36. The District Court declined to address the economic loss rule. A-126 at 11. Wells Fargo cites *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 435 (Ill. 1982), a product defect case that precluded a tort recovery for damage to the defective product itself. It argues for a broad application of the economic loss rule.

However, as the Illinois Supreme Court also held in *Moorman Mfg.*, Illinois defines "economic loss" narrowly:

> "Economic loss" has been defined as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits – without any claim of personal injury or damage to other property" . . . as well as "the diminution in the value of the product because it is inferior in quality and does not work for the general

purposes for which it was manufactured and sold."

435 N.E.2d at 449.

### 1. The Kafkas' Tort Claim Does Not Fall Within the Narrow Economic Loss Rule

As an initial matter, Wells Fargo has not shown that the Kafkas' tort claim falls within Illinois's narrow economic loss rule. The Kafkas do not seek tort damages for inadequate value, or cost of repair or replacement of a defective product. They do not seek consequential loss of profits – they seek only their actual out-of-pocket loss of principal. Nor do they seek any diminution in value of any "product," and certainly not because of any product's inferior quality or because it is unfit for a particular purpose. *Cf. Moorman Mfg.*, 435 N.E.2d at 449. The Kafkas' tort claim for loss of all their principal in the Partnership Funds and the Preservation Fund plainly falls outside the narrow definition of "economic loss," and thus it is *not* subject to the economic loss rule under Illinois law.

### 2. The Tort Duty Here is Extracontractual

Even if the Kafkas' negligence claim were within Illinois's economic loss rule, Wells Fargo admits there are "four exceptions" to the rule: (1) "where the plaintiff sustained damage, *i.e.*, personal injury or property damage, resulting from a sudden or dangerous occurrence"; (2) "where the plaintiff's damages are proximately caused by a defendant's intentional, false misrepresentation, *i.e.*, fraud"; (3) "where the plaintiff's damages are proximately caused by a negligent

misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions"; and (4) "where the tort duty is extracontractual." *See* Doc. No. 50 at 31 (quoting *Rasgaitis v. Waterstone Fin. Grp.*, 2013 IL App. (2d) 111112, ¶ 56 (2013)). Two of those exceptions apply here.

*First*, the tort duty the Kafkas invoke is unquestionably "*extracontractual*." Indeed, throughout its response brief, Wells Fargo repeatedly and forcefully insists it has *no contractual relationship* with the Kafkas. That much is not in dispute. Here, the tort duty arises not from any contract between the parties, but rather from the foreseeability – in fact, the near certainty – of injury to investors when Wells Fargo forced LJM to immediately liquidate the Preservation Fund and the Partnership Funds in the midst of the temporary market disruption.

Most importantly, "[t]he economic loss doctrine applies to the service industry *only where the duty of the party performing the service is defined by the contract between him and his client*." *Kanter v. Deitelbaum*, 648 N.E.2d 1137, 1139 (Ill. App. 1995) (emphasis added) (citing *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 159 Ill. 2d 137, 636 N.E.2d 503 (Ill. 1994)). Thus, "[w]here a duty arises outside of that contract, the doctrine does not prohibit recovery under a tort theory for the negligent breach thereof." *Id.*[3]

---

[3] Outside the narrow context of the economic loss rule, Illinois courts allow negligence claims for acts that cause only economic harm. *See*, *e.g.*, *Daugherty v. Blaase*, 548 N.E.2d 130 (Ill. App. 1989) (recognizing negligence action against

Because it arose in the service industry context, *Kanter* applies directly to this case. Here, as in *Kanter*, the duty of care giving rise to the Kafkas' negligence claims are not defined by any (non-existent) contract between them and Wells Fargo. Nor is their negligence claim defined by any contract between Wells Fargo and LJM. Rather, as explained in Section A above, the duty on which the Kafkas' negligence claim is based arises from the common law tort principle of foreseeability. Wells Fargo owed the Kafkas a duty of care because it was reasonably foreseeable (if not certain) they would be harmed by Wells Fargo's precipitous, self-interested acts on February 6, 2018.

Despite its obvious relevance, Wells Fargo did not cite or discuss the *Kanter* decision in its response brief. Instead, it argues the Kafkas seek to impose a "free-floating" extracontractual duty upon it that would be "incompatible with Illinois law and the federal regulatory scheme for futures trading." Doc. 50 at 35. For the reasons discussed in Section A above, Wells Fargo far exceeded its limited, *non-discretionary* role as a FCM when it took control of the Funds and ordered the complete and immediate liquidation of the Portfolio.

In *Congregation of the Passion*, the Illinois Supreme Court held that the

---

insurance broker); *Detterbeck v. Detterbeck*, 2019 Ill. App. Unpub. LEXIS 2251 (Ill. App. Dec. 11, 2019) (reversing dismissal of negligence claim against accountant); *Voutiritsas v. McCuaig, Haeger, Bolz & McCarty, LLC*, 2011 Ill. App. Unpub. LEXIS 3205 (Ill. App. Dec. 21, 2011) (recognizing negligence claim against attorney).

economic loss rule does not bar recovery for economic losses for professional malpractice actions against accountants, holding:

> The evolution of the economic loss doctrine shows that the doctrine is applicable to the service industry *only where the duty of the party performing the service is defined by the contract* that he executes with his client."

*Congregation*, 159 Ill. 2d at 162, 636 N.E.2d at 514 (emphasis added).

In *Fireman's Fund Ins. Co. v. SEC Donohue, Inc*., 281 Ill. App. 3d 789, 666 N.E.2d 881 (1996), *aff'd as modified*, 176 Ill. 2d 160, 679 N.E.2d 1197 (1997), the plaintiff sought to recover the cost to repair an underground water system allegedly caused by a subcontractor's reliance on negligently prepared engineering plans. The Appellate Court of Illinois was asked to apply the economic loss to engineers. In deciding to do so, the Appellate Court distinguished accountants and lawyers, on the one hand, from engineers on the other. Referring to the Illinois Supreme Court's decision in *Congregation*, the Appellate Court said:

> The court [in *Congregation*] explained that, as skilled professionals, accountants have a duty of reasonable professional competence that exists *independent of any contract*.
>
> The court also supported its holding by comparing accountants to attorneys. The court explained that accountants are more like attorneys than architects because "the ultimate result of the relationship between the professional and client is something intangible."

281 Ill. App. 3d at 795, 666 N.E.2d at 885 (citing *Congregation*, 159 Ill. 2d at 163, 636 N.E.2d at 515) (emphasis added).

Because Wells Fargo's tort duty here is "independent of any contract" with

the Kafkas, it is more like the duties of accountants and lawyers discussed in *Congregation* and *Fireman's Fund*, and thus falls within this "extracontractual" exception to the narrow economic loss rule.

### 3. The Kafkas' Loss Resulted from a Sudden or Dangerous Occurrence

Under settled Illinois law, the economic loss rule also does not apply "where the plaintiff sustained personal injury or property damage resulting from a sudden or dangerous occurrence." *In re Chicago Flood Litig.*, 176 Ill. 2d 179, 200-01, 680 N.E.2d 265, 275-76 (Ill. 1997), *modified by Andrews v. Metro. Water Reclamation Dist. of Greater Chicago*, 2019 IL 124283, 160 N.E.3d 895 (Ill. 2019) (citing *Moorman*, 91 Ill.2d at 86, 435 N.E.2d 443).

In *Chicago Flood*, the "calamitous, sudden, or dangerous event or occurrence" was a flood in a tunnel running under the Chicago River allegedly caused by the defendants when the performed road repair to a bridge running above the tunnel. 176 Ill. 2d at 184-85, 200. But the "sudden or dangerous occurrence" exclusion is not limited to construction cases. As the Illinois Supreme Court explained in *Chicago Flood*, it is meant to distinguish cases for which a negligence claim lies from those based on "disappointed commercial expectations, gradual deterioration, internal breakage, or other nonaccidental causes, rather than a dangerous event," for which there is no viable claim. *Id.* at 200-01 (citing *Redarowicz v. Ohlendorf*, 92 Ill. 2d 171, 177–78, 441 N.E.2d 324 (1982) (internal citations omitted); *Moorman*, 91 Ill.

2d at 86, 435 N.E.2d at 450). As long as "the sudden, dangerous, or calamitous occurrence . . . result[s] in personal injury or property damage," damages are recoverable in tort under the "sudden or dangerous occurrence" exclusion. *Id*.

The "sudden or dangerous" exclusion applies if the condition is either sudden or dangerous; both conditions need not be met for a claim to be excluded from the economic loss rule (if it falls generally within the narrow rule at all). However, it cannot be reasonably disputed that the market event on February 5 and 6, 2018, was both sudden *and* dangerous.

As to its suddenness of occurrence, the Complaint alleges that the liquidity event occurred when volatility spiked on February 5, 2018. Am. Comp. at 8 ¶ 36. By their nature, such volatility events are both sudden and often very brief, frequently lasting only hours. *Id*. ¶ 37. Just as the tunnel flood at issue in *Chicago Flood*, the market disruption in February 2018 was a sudden occurrence rather than mere disappointed commercial expectations, a gradual deterioration, internal breakage, or some other similar non-accidental cause.

Thus, the occurrence was sufficiently sudden to remove the Kafkas' tort claim from the economic loss rule.

Likewise, the liquidity event on February 5, 2018, also was indisputably "dangerous." As the Illinois Supreme Court held in *Chicago Flood*, the economic loss rule applies "to losses incurred without any personal injury or property

damage." 176 Ill. 2d at 200 (citing *Moorman*, 91 Ill.2d at 82). Therefore, the "danger" does not mean danger to life or personal safety.

Plainly, the liquidity event was dangerous. Indeed, while the Kafkas vigorously dispute its right to do so, Wells Fargo insists it was justified in taking the extraordinary action it did early in the morning on February 6, 2018, even before the market opened, to effectively take control of the Portfolio and force LJM to liquidate the Portfolio on demand. The asserted justification was for Wells Fargo to protect itself from the dangerous risk of loss on the investments it held as an FCM. While the Kafkas allege that Wells Fargo far exceeded the limited scope of its non-discretionary and ministerial authority as an FCM, having done as it did on February 6, 2018, Wells Fargo cannot credibly argue that the liquidity event posed no danger to the Portfolio.

Thus, the occurrence also was sufficiently dangerous to remove the Kafkas' tort claim from the economic loss rule.

### D. The Kafkas Plausibly Allege Tortious Interference Claims Against Wells Fargo

Wells Fargo argues in its response brief that the Kafkas have failed to state plausible claims for tortious interference with contract and tortious interference with business relations. It does not cite any case, and the Kafkas are unaware of any controlling authority, requiring those tortious interference claims to be pled with particularity or that they are subject to any special, heightened pleading standard.

Wells Fargo simply argues – mistakenly – that the Kafkas have done "nothing more than recite the bare elements" of both claims. Doc. No. 50 at 38.

The Kafkas allege the events that took place on February 5 and 6, 2018, in careful – almost minute-by-minute – detail. Their allegations begin with the start of the liquidity event following a sharp rise in the volatility index during trading hours on February 5 and culminate with Wells Fargo's wrongful liquidation of the Portfolio early in the morning on February 6 despite LJM's repeated pleas that it not do so. *See* Am. Comp. at 10-13, & 15 ¶¶ 44, 52, 56, & 60-63.

Wells Fargo also argues that the Kafkas "do not explain *how* LJM breached its agreements with them, let alone how such a breach was induced by" Wells Fargo. Doc. No. 50 at 39. That argument strains credibility. Plainly, LJM, as a general partner in the partnerships and also as the investment advisor, had contractual duties to the Kafkas to manage their investments in the Preservation Fund and the Partnership Funds prudently. That prudent judgment – as LJM made clear to Wells Fargo on February 5 and 6, 2018 – was to leave the investments in place so that LJM could properly manage the market fluctuations as it had done successfully in the past. *See* Am. Comp. at 10-11, 13-14, 33, 36, & 37 ¶¶ 46-52, 60-65, 154-157, 181, & 183. Because Wells Fargo forced LMJ to liquidate the Portfolio when LJM believed doing so was *not* in the best interests of the Kafkas and all the other investors in the Preservation Fund and the Partnership Funds, LJM breached its

contractual duty to the Kafkas and the other investors. *That* is how LJM breached its agreements with the Kafkas and the Funds' other investors.

Wells Fargo's argument that the Kafkas have not alleged how LJM's breach was induced by Wells Fargo borders on frivolous. The Complaint bristles with allegations that Wells Fargo assumed control over the Portfolio and over LJM's operations, beginning when it called LJM in the evening on February 5, 2018, and recklessly terminated its position as FCM for the Preservation Fund and the Partnership Funds in the absence of any default by LJM. A-19 Am. Comp. ¶ 56. Wells Fargo's effort to take control of the Portfolio continued when it ordered LJM to immediately liquidate the entire Portfolio, going so far as to order LJM to purchase and then execute non-existent E-MINI futures contracts, without any authority or legal right to do so. *Id*. It followed the phone call with a formal letter from Wells Fargo, written on February 5, 2018, and sent to LJM at 7:36 a.m. on February 6, 2018, terminating the FCM Agreements for Wells Fargo's convenience, purportedly as of right under § 24 of the FCM Agreements. A-19 Am. Comp. ¶ 58. Wells Fargo's effort to induce LJM to breach its contracts with the Kafkas went as far as sending two of its own employees to LJM's headquarters in Chicago on the morning of February 6, 2018, to make sure that LJM did as Wells Fargo ordered it to do. A-24 Am. Comp. ¶ 85.

For the same reason, and in the same manner, those same actions –

demonstrating Wells Fargo's exercise of control over the Portfolio to force LJM to breach its investment contracts with the Kafkas – also interfered with the Kafkas' business relations with LJM.

Wells Fargo's argument that the Kafkas fail adequately to "allege the intent element of both tortious interference claims" is easily overcome. As Federal Rule of Civil Procedure 9(b) makes clear, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). While intent is an element of both claims, Wells Fargo again does not cite any case, and the Kafkas are unaware of any controlling authority, requiring intent to be pled specifically or under any other heightened pleading standard.

The Kafkas have alleged a lengthy and heated exchange between Wells Fargo and LJM beginning on February 5 and continuing until February 6, 2018, in which LJM vigorously sought to rebuff Wells Fargo's efforts to force the Portfolio to be liquidated.  A-18-20 Am. Comp. ¶¶ 53-58. Plainly, these allegations are more than sufficient to permit a reasonable inference that Wells Fargo intended to interfere with LJM's repeated attempts to perform its contractual duty to the Kafkas to manage their investments prudently.

### E.     **Wells Fargo Cannot Invoke the Business Judgment Rule Here**

Wells Fargo erroneously argues that the Kafkas' aiding and abetting breach of fiduciary duty claim should be dismissed because *LJM's* actions were allegedly

protected by the business judgment rule. Doc. No. 50 at 46-48.

"The business judgment rule creates 'a presumption that in making a business *decision* the directors of a corporation acted on an informed basis, in good faith and in the *honest belief that the action taken was in the best interests of the company*.'" *Sherman v. Ryan*, 392 Ill. App. 3d 712, 722, 911 N.E.2d 378, 389 (2009) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)) (emphasis added).

The business judgment rule did not and could not protect the "actions" LJM took for two simple reasons. *First*, the directors of LJM – on whose behalf Wells Fargo's argument erroneously invokes the business judgment rule – made no "decision" to liquidate the Portfolio. That decision was *forced upon them by Wells Fargo*. Significantly, Wells Fargo does not claim otherwise. Its argument is carefully constructed to avoid using the word "decision" when referring instead to the "actions" LJM took to liquidate the Portfolio. *See* Doc. No. 50 at 46-47.

*Second*, the directors of LJM did not honestly believe liquidating the Portfolio on February 6, 2018, in the midst of the liquidity event was in the best interest of either the Preservation Fund or the Partnership Fund. To the contrary, LJM vehemently opposed liquidating the Portfolio when Wells Fargo directed them to do so. Plainly, they did not believe – honestly or otherwise – that the liquidation was in the Funds' best interest. To the contrary, they claimed repeatedly that the Funds would be best served by letting LJM manage the Portfolio without liquidating for

the short duration of the market disruption.

Finally, Wells Fargo argues it cannot be held liable for aiding and abetting LJM's breach of fiduciary duty because it did not merely *aid and abet* LJM to breach the duty, it *coerced* it to do so. Recognizing that the term "aiding and abetting" implies rendering assistance to the breaching party, and that most cases involve rendering "substantial assistance" to the primary wrongdoer, Wells Fargo again has not cited any authority – and the Kafkas are unaware of any – holding that the tort of aiding and abetting a breach of fiduciary duty is not sufficiently broad to include the more drastic act of coercing it. Certainly, it extends to LJM's decision to capitulate to Wells Fargo's demands and liquidate the Portfolio against its best judgment.

That the tort has not arisen before in such drastic circumstances is hardly a reason to hold that a defendant who is alleged to have aided and abetted another party to breach its fiduciary duty may avoid liability by claiming it did not merely aid and abet the primary wrong, but rather it participated in directing it. Such a holding would undermine the very purpose for the tort of aiding and abetting in the first instance.

## CONCLUSION

For these additional reasons, the Court should reverse the District Court's dismissal of the Complaint, reinstate the Amended Complaint, and remand the action for further proceedings.

Dated:  May 2, 2024

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:  *s/ Mark C. Rifkin*

Mark C. Rifkin (MR-0904)
270 Madison Avenue
9th Floor
New York, NY  10016
(212) 545-4600
rifkin@whafh.com

Kenneth Gilman
**GILMAN LAW LLP**
Beachway Professional Center Tower
8951 Bonita Beach Road, S.E.
Suite 525
Bonita Springs, FL 34135
(239) 571-3518
kgilman@gilmanlawllp.com

*Attorneys for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared in proportionally spaced 14-point font using Microsoft Word, and according to that software, it contains 5,283 words, not including the cover, the table of contents, the table of authorities, and this certificate.

*s/ Mark C. Rifkin*
MARK C. RIFKIN
